**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE NASHVILLE DIVISION**

| | | |
|---|---|---|
| **AVERTIUM TENNESSEE, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:26-cv-01053** |
| | ) | |
| **PROTOCALL SERVICES, INC.,** | ) | **JUDGE CAMPBELL** |
| | ) | **MAGISTRATE JUDGE FRENSLEY** |
| **Defendant.** | ) | |

---

# ANSWER

---

Defendant ProtoCall Services, Inc. ("Protocall"), by and through counsel, submits this Answer (with affirmative defenses) to the Complaint of Plaintiff Avertium Tennessee, Inc. ("Avertium"). All allegations of the Complaint are hereby denied except those specifically admitted as follows:

1. This is an action for breach of a written services contract. Defendant ProtoCall Services, Inc. contracted with Plaintiff Avertium Tennessee, Inc. for multi-year managed cybersecurity services running through July 11, 2026. When ProtoCall decided it no longer wanted those services, it attempted to walk away from its payment obligations through an informal email that did not satisfy the contract's negotiated termination and notice requirements. ProtoCall then stopped paying its monthly invoices while Avertium continued to perform and stood ready to perform through the end of the term. As a result of ProtoCall's breach, Avertium has been deprived of $249,145.20 in fees owed under the parties' contract. Avertium brings this action to recover those amounts, together with interest, costs, and all other relief to which it is entitled.

**RESPONSE: Admitted only that there was a written services contract between the parties. The remaining allegations are denied.**

## THE PARTIES

2. Plaintiff Avertium Tennessee, Inc. is a Delaware corporation with its principal place of business at 1431 Centerpoint Blvd, Suite 150, Knoxville, Tennessee 37932.

**RESPONSE: Admitted upon information and belief.**

3. Avertium is a cybersecurity services company that partners with mid-market and enterprise organizations to assess risk, design scalable security programs, and provide ongoing protection that improves both security and compliance.

**RESPONSE: Protocall lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

4. Defendant ProtoCall Services, Inc. is an Oregon corporation with its principal place of business at 621 SW Alder Street, Portland, Oregon 97205.

**RESPONSE: Admitted.**

5. ProtoCall is a provider of specialty telephonic behavioral health services.

**RESPONSE: Admitted.**

6. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. Avertium is a citizen of Tennessee and Delaware. ProtoCall is a citizen of Oregon.

**RESPONSE: Admitted.**

7. The Court has personal jurisdiction over ProtoCall because ProtoCall did business in the State of Tennessee by executing contracts with Avertium, to be performed, in part, in Tennessee, and by voluntarily engaging in a years-long course of dealing with Avertium in Tennessee. Additionally, ProtoCall consented to the exclusive jurisdiction of the courts located in Davidson County, Tennessee for any dispute related to the contract at issue here.

**RESPONSE: Protocall does not contest this Court's personal jurisdiction over Protocall. The remaining allegations are denied.**

8. Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Avertium's claims occurred there. Specifically, the parties consented to the exclusive jurisdiction of the courts located in Davidson County for any dispute related to the contract at issue here.

**RESPONSE: Protocall does not contest that venue is proper in this Court. The remaining allegations are denied.**

## FACTUAL BACKGROUND

### The Parties Business Relationship and the 2023 SOWs

9. Avertium's relationship with ProtoCall dates to 2016, when Avertium's predecessor, Sword & Shield Enterprise Security, Inc., began performing "professional services" for ProtoCall, including HITRUST certification and network security consulting).

**RESPONSE: Admitted.**

10. In this industry, "professional services" and "managed services" are terms of art. Professional services concern specific projects bounded by a clear start and end date, while managed services are continuous and often multi-year

**RESPONSE: Protocall lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

11. The parties executed two contracts called "Statements of Work" ("SOWs") in April 2023. The Professional and Managed Services Statement of Work (the "Managed Services SOW") (attached hereto as **Exhibit 1**), was, as relevant here, for managed services, including 24/7 managed security monitoring and threat detection through a LogRhythm SIEM platform, for a 24-

month term at a total contract value of $349,648.[1]

**RESPONSE: Admitted only that Exhibit 1 to the Complaint is a true and correct copy of what it purports to be, the terms of which speak for themselves. Any remaining allegations are denied.**

12. The Professional Services Statement of Work (the "Professional Services SOW") (attached hereto as **Exhibit 2**) was for professional services, including HITRUST r2 certification assessments, SOC 2 Type 1 and Type 2 audits, identity data mapping and privacy assessments, MARS-E compliance assessments, and implementation and configuration of a GRC platform, for a 24-month term at a total contract value of $515,688..

**RESPONSE: Admitted only that Exhibit 2 to the Complaint is a true and correct copy of what it purports to be, the terms of which speak for themselves. Any remaining allegations are denied.**

13. The parties agreed that the Managed Services SOW would be "subject to Avertium Services Terms and Conditions V1, ('the Agreement')," that "[a]ll capitalized terms used, but not otherwise defined herein, shall have the meanings set forth in the Agreement," and that "[t]his SOW is incorporated by reference into the Agreement."

**RESPONSE: Protocall adopts by reference its response to Paragraph 11.**

14. At all relevant times, the Avertium Services Terms and Conditions V1 ("Avertium T&Cs") were publicly available on Avertium's website, at https://www.avertium.com/services-terms-and-conditions-v1. A true and accurate copy of the Avertium T&Cs is attached hereto as"

---

[1] The "incident response" services in this SOW (and the MS Change Order discussed below) are considered professional services. However, those services were invoiced separately and are not at issue in this lawsuit. Avertium's claims concern unpaid invoices for managed services only.

**RESPONSE: Protocall lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

**Exhibit 3**.

<u>**RESPONSE**</u>**:** **Admitted upon information and belief that Exhibit 3 to the Complaint is a true and correct copy of what it purports to be, the terms of which speak for themselves. The remaining allegations are also admitted upon information and belief.**

15. Section 2.0 of the Avertium T&Cs addresses payment terms. It provides in part: "Client will pay fees stated in Order(s) or SOW(s), plus expenses incurred by Avertium with Client's approval ('Fees'). Invoices are payable thirty (30) days after the invoice date, unless different terms are stated in a SOW or Order."

<u>**RESPONSE**</u>**:** **Admitted upon information and belief only that Exhibit 3 to the Complaint is a true and correct copy of what it purports to be, the terms of which speak for themselves. Any remaining allegations are denied.**

16. Section 9.2 of the Avertium T&Cs addresses termination. Subsection (b) provides as follows, addressing if a client wishes to terminate a SOW for managed services:

> Client may terminate any SOW for managed services due to dissatisfaction with the quality of such Services by providing at least sixty (60) days prior written notice to Avertium, provided that if Avertium resolves Client's dissatisfaction during this sixty (60) day period termination shall not occur. The termination of any SOW for managed services will not absolve the Client of its obligations for any "third-party" software Avertium has acquired at the Clients request and Client will be responsible for those amounts until the underlying agreement expires.

<u>**RESPONSE**</u>**:** **Protocall adopts by reference its response to Paragraph 15.**

17. Section 10.7 of the Avertium T&Cs addresses notice. It provides:

> All notices given pursuant to this Agreement must be in writing, sent to the addresses below and will be effective: (i) upon receipt if hand delivered; (ii) on the next business day after being sent by email or facsimile; (iii) on the third business day following deposit with the postal service.
>
> ***With respect to Avertium, notices must be delivered to:***
>
> Avertium LLC

Attn: Legal Department

1431 Centerpoint Blvd, Suite 150

Knoxville, TN 37932

E-mail: legal@avertium.com

**<u>RESPONSE</u>: Protocall adopts by reference its response to Paragraph 15.**

18. Section 10.4 of the Avertium T&Cs addresses disputes. It provides that "[t]his Agreement is governed by the laws of the State of Tennessee, not including its choice of law rules," and that "[b]oth Parties irrevocably consent to the exclusive jurisdiction of the courts in the State of Tennessee, County of Davidson for any dispute related to this Agreement."

**<u>RESPONSE</u>: Protocall adopts by reference its response to Paragraph 15.**

19. Section 10.4 also provides that "[n]o legal action may be brought by one Party against the other Party more than one (1) year after the event giving rise to the cause of action, except for actions due to non-payment of Fees or violation of Avertium's IP Rights."

**<u>RESPONSE</u>: Protocall adopts by reference its response to Paragraph 15.**

20. This action is for non-payment of fees and thus falls outside the scope of Section 10.4's one-year limitations period.

**<u>RESPONSE</u>: Denied.**

**The Change Orders**

21. In June 2023, the parties executed a Change Order (the "2023 PS Change Order") modifying the terms of the Professional Services SOW. A true and accurate copy of the 2023 PS Change Order is attached hereto as **Exhibit 4**.

**<u>RESPONSE</u>: Admitted only that Exhibit 4 to the Complaint is a true and correct copy of what it purports to be, the terms of which speak for themselves. Any remaining allegations are denied.**

22. Specifically, the 2023 PS Change Order replaced the reference to "Eramba platform" in the original Professional Services SOW with the generic term "GRC platform," with no changes to deliverables, term, or pricing.

**RESPONSE: Protocall adopts by reference its response to Paragraph 21.**

23. A Governance, Risk, and Compliance ("GRC") platform is enterprise software that integrates governance structures, risk management processes, and compliance controls into a centralized system to help an organization meet legal and regulatory obligations. It provides a unified framework for identifying, assessing, and mitigating risks while documenting and demonstrating adherence to applicable statutes, regulations, and internal policies.

**RESPONSE: Protocall lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

24. In March 2024, the parties executed a second no-cost Change Order (the "2024 PS Change Order") modifying the terms of the Professional Services SOW. A true and accurate copy of the 2024 PS Change Order is attached hereto as **Exhibit 5**.

**RESPONSE: Admitted only that Exhibit 5 to the Complaint is a true and correct copy of what it purports to be, the terms of which speak for themselves. Any remaining allegations are denied.**

25. Specifically, the 2024 PS Change Order revised the scope of the professional services engagement from FedRAMP readiness and privacy assessments to a HITRUST r2 assessment combined with a StateRAMP assessment under a pilot program administered by the HITRUST Alliance

**RESPONSE: Protocall adopts by reference its response to Paragraph 24.**

26. The 2024 PS Change Order also revised the deliverables of the Professional Services SOW. It replaced the Year 1 deliverables with a "HITRUST r2 Bridge Assessment" and a

"HITRUST r2 + StateRAMP Assessment," and the Year 2 deliverables with a "HITRUST r2 Interim + StateRAMP Assessment." The term and pricing of the Professional Services SOW were not changed.

**RESPONSE: Protocall adopts by reference its response to Paragraph 24.**

27. This scope change was initiated by ProtoCall after it was invited by the HITRUST Alliance (a widely recognized industry organization that develops and maintains a common security and privacy framework used by healthcare and other regulated industries to certify information protection programs) to participate in the StateRAMP pilot program, which ProtoCall believed would provide a path toward FedRAMP compliance through reciprocity with its existing HITRUST certification.

**RESPONSE: Admitted.**

28. HITRUST represented to both Avertium and ProtoCall that Avertium was qualified to serve as the external assessor for the StateRAMP pilot program.

**RESPONSE: Protocall lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

29. After the parties executed the 2024 PS Change Order, HITRUST reversed its position and informed Avertium that Avertium did not have a certification required to provide the StateRAMP assessment—specifically, that the external assessor for the StateRAMP pilot program must be a Third-Party Assessment Organization ("3PAO"), which Avertium was not.

**RESPONSE: Admitted upon information and belief.**

30. Avertium promptly referred ProtoCall to qualified 3PAO firms, and ProtoCall selected MegaPlanIT. Avertium facilitated the transition of ProtoCall receiving these professional services from MegaPlanIT.

**RESPONSE: Admitted upon information and belief.**

31. Because Avertium could no longer deliver the StateRAMP component of the Professional Services SOW, the parties agreed to terminate the Professional Services SOW.

**<u>RESPONSE</u>: Admitted.**

32. ProtoCall chose to convert the remaining value of the Professional Services SOW into an extension and expansion of the Managed Services SOW. In July 2024, the parties executed a Change Order (the "MS Change Order") modifying the terms of the Managed Services SOW to effect these changes. A true and accurate copy of the MS Change Order is attached hereto as **Exhibit 6**.

**<u>RESPONSE</u>: The first sentence is admitted. For the remaining allegations, admitted only that Exhibit 6 to the Complaint is a true and correct copy of what it purports to be, the terms of which speak for themselves. Any other remaining allegations are denied.**

33. The MS Change Order provided that "the parties agree to terminate [the Professional Services SOW] and all financial obligations of the Client and delivery obligations of Avertium cease."

**<u>RESPONSE</u>: Admitted only that Exhibit 6 to the Complaint is a true and correct copy of what it purports to be, the terms of which speak for themselves. Any remaining allegations are denied.**

34. The MS Change Order further provided: "The purpose of this change order is to replace the value associated [with the Professional Services SOW] by extending [the Managed Services SOW] thirteen (13) months and transitioning from Managed LogRhythm to Avertium's Managed XDR for Microsoft."

**<u>RESPONSE</u>: Protocall adopts by reference its response to Paragraph 33.**

35. The MS Change Order listed the original task/scope and the revised task/scope as follows:

| Original Task/Scope | Revised Task/Scope |
| --- | --- |
| "Managed LogRhythm MTP for up to 1,000 MPS with 90 days hot storage and 80 Pro Agents; and<br>Incident Response Retainer Flex (80 hrs)<br>Incident Response Retainer Flex (80 hrs) with the ability to reallocate unused retainer hours within the term of the SOW" | "Managed XDR for Microsoft for up to 650 endpoints<br>Incident Response Retainer Flex (80 hrs)" |

**RESPONSE: Protocall adopts by reference its response to Paragraph 33.**

36. The parties also agreed that the original term of the Managed Services SOW (May 11, 2023, through May 10, 2025) would be "extended thirteen (13) months to 7/11/2026."

**RESPONSE: Denied.**

37. The parties agreed to an increase in pricing to reflect the additional services being added, "from $14,568.66 to $16,284.00 per month for a total of $390,816.00 for the remainder of the term."

**RESPONSE: Denied.**

38. The $16,284 monthly fee was comprised of $13,841.40 for Managed XDR for Microsoft services, and a $2,442.60 incident response retainer, which was invoiced separately.

**RESPONSE: Denied.**

39. The MS Change Order further stated that ProtoCall would be "granted access to Avertium's GRCaaS platform through the end of the term which is 7/11/2026."

**RESPONSE: Protocall adopts by reference its response to Paragraph 33.**

40. The MS Change Order also made clear that "[u]nless otherwise stated herein, all other terms and conditions of the original [Managed Services] SOW shall remain in full force and effect." This includes the Avertium T&Cs incorporated by reference into the Managed Services SOW.

**RESPONSE: Protocall adopts by reference its response to Paragraph 33.**

41. Exhibit A to the MS Change Order described in detail the services that Avertium would provide to ProtoCall under the parties' revised agreement.

**<u>RESPONSE</u>: Protocall adopts by reference its response to Paragraph 33.**

42. Exhibit A listed several "Client Responsibilities," including the following:

> Client will promptly obtain and provide to Avertium any required licenses, approvals or consents necessary for Avertium' performance of the services. At a mini- mum, Avertium requires Client to provide:
>
> - A dedicated Microsoft Azure subscription for Microsoft Sentinel
> - Log Analytics Workspace (LAW)
> - Necessary Microsoft Defender XDR licensing for all in scope users and systems to be monitored and protected by the Service

**<u>RESPONSE</u>: Protocall adopts by reference its response to Paragraph 33.**

43. The parties executed the MS Change Order on July 8, 2024.

**<u>RESPONSE</u>: Admitted.**

**The Kerns Email and ProtoCall's Failure to Pay Invoices**

44. Each of the SOWs and Change Orders discussed above was signed on behalf of ProtoCall by Chris Kerns, ProtoCall's then Director of Information Technology and Information Security Officer

**<u>RESPONSE</u>: Admitted.**

45. On September 30, 2024, Kerns sent an email to Avertium employees Matt Ryan and Rob Wille (the "Kerns Email"), stating as follows:

> Good Afternoon Matt and Rob,
>
> First, apologies for this coming via an email. The Avertium team has been a huge support factor in Protocall's growth/maturation in the compliance realm and for that, I don't know I could ever fully express the gratitude and appreciation.
>
> Unfortunately, and this is the least fun part of any of my role/s past, present or

> future, Protocall has decided to give notice regarding termination of the contract, primary reasons being that we have yet to realize the GRC portal, and the recently identified increase in costs for MDR with the move away from LogRythm.
>
> It would be great to check in directly, and I want to make sure I am providing any formal documentation for the termination request etc, so please let me know if you have availability for a call this week or next, and I'll do my best to accommodate.
>
> Thank you!

**RESPONSE: Admitted.**

46. ProtoCall has since asserted that the Kerns Email terminated the Managed Services SOW.

**RESPONSE: Admitted.**

47. However, the Kerns Email was never sent to the Avertium Legal Department at 1431 Centerpoint Blvd, Suite 150 Knoxville, TN 37932, or the email address legal@avertium.com. Thus, it did not comply with the notice provision in Section 10.7 of the Avertium T&Cs.

**RESPONSE: Protocall lacks knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence. The remaining allegations are denied.**

48. Because the Kerns Email did not comply with the notice provision in Section 10.7 of the Avertium T&Cs, it did not effect termination of the Managed Services SOW.

**RESPONSE: Denied.**

49. Additionally, the Kerns Email did not raise "dissatisfaction with the quality" of the managed services provided by Avertium under the Managed Services SOW, pursuant to Section 9.2(b) of the Avertium T&Cs.

**RESPONSE: Denied.**

50. Even if it did, Avertium cured any alleged dissatisfaction within the 60-day cure period mandated by Section 9.2(b) of the Avertium T&Cs. Specifically, Avertium delivered access to the GRC portal on November 11, 2024, 42 days after the Kerns Email was sent.

**<u>RESPONSE</u>: Denied.**

51. ProtoCall's conduct after the Kerns Email was sent is inconsistent with a terminated agreement. ProtoCall participated in meetings and discussions with Avertium well into December 2024, regarding exploring cost-saving options and proposing a multi-vendor coexistence model.

**<u>RESPONSE</u>: Denied.**

52. Meanwhile, Avertium continued to uphold its end of the Managed Services SOW after the Kerns Email was sent. Avertium delivered the GRC solution to ProtoCall on November 11, 2024, in accordance with the scope of the Managed Services SOW, as modified by the MS Change Order.

**<u>RESPONSE</u>: Denied.**

53. Avertium also sent a detailed response on October 16, 2024, rejecting ProtoCall's assertion that the Kerns Email effected termination of the Managed Services SOW, and several follow-ups.

**<u>RESPONSE</u>: Admitted only that Avertium responded to Protocall on October 16, 2024, the language of which speaks for itself. Any remaining allegations are denied.**

54. ProtoCall eventually stopped responding, and stopped paying its monthly invoices for managed services. ProtoCall ceased payment after December 2024.

**<u>RESPONSE</u>: The second sentence is admitted. The remaining allegations are denied.**

55. Avertium continued following up with ProtoCall regarding the unpaid invoices for managed services and continued its performance until July 11, 2026, the end of the term, as it was obligated to do under the Managed Services SOW.

**<u>RESPONSE</u>: Denied.**

56. The Managed Services SOW remained in full force and effect through July 11, 2026. ProtoCall's obligation to pay monthly fees continued unabated.

**<u>RESPONSE</u>: Denied.**

57. ProtoCall owes Avertium $249,145.20 in unpaid invoices under the Managed Services SOW, as modified by the MS Change Order. This amounts to 18 months of unpaid invoices in the amount of $13,841.40 for Managed XDR for Microsoft services.

**<u>RESPONSE</u>: Denied.**

58. Avertium made multiple good-faith efforts to resolve this dispute before filing this lawsuit. The parties participated in pre-suit mediation through JAMS on July 8, 2026. The mediation was unsuccessful.

**<u>RESPONSE</u>: Admitted only that the parties (unsuccessfully) participated in mediation through JAMS on July 8, 2026. The remaining allegations are denied.**

**COUNT I**
**Breach of Contract**

59. Plaintiff restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

**<u>RESPONSE</u>: Protocall restates and adopts by reference its responses to the allegations contained in the preceding paragraphs of this Complaint.**

60. Avertium and ProtoCall entered into the Managed Services SOW, which incorporated the Avertium T&Cs, and which constitutes a valid and enforceable contract (the "Agreement").

**<u>RESPONSE</u>: Admitted.**

61. Avertium and ProtoCall entered into the MS Change Order, a valid and enforceable contract that modified the terms of the Agreement.

**<u>RESPONSE</u>: Admitted.**

62. ProtoCall breached the Agreement by failing and refusing to pay the monthly ser-

vice fees for managed services, beginning in January 2025.

**<u>RESPONSE</u>: Denied.**

63. ProtoCall's attempted termination of the Agreement was invalid and ineffective because: (a) the notice was not sent to the contractual notice address required by Section 10.7 of the Avertium T&Cs; (b) the notice did not invoke Section 9.2(b); (c) the stated reasons do not constitute dissatisfaction with service quality; (e) even if the stated reasons did constitute dissatisfaction with service quality, Avertium cured the issue within the 60-day cure period; and (d) managed services may not be terminated for convenience under the Avertium T&Cs.

**<u>RESPONSE</u>: Denied.**

64. The Agreement remained in full force and effect through July 11, 2026. ProtoCall's obligation to pay monthly fees continued unabated..

**<u>RESPONSE</u>: Denied.**

65. As a direct and proximate result of ProtoCall's breach, Avertium has suffered damages in the amount of $249,145.20 in unpaid service fees, or such greater amount as may be proven at trial.

**<u>RESPONSE</u>: Denied.**

### COUNT II
### Unjust Enrichment
### (In the alternative)

66. Plaintiff restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

**<u>RESPONSE</u>: Protocall restates and adopts by reference its responses to the allegations contained in the preceding paragraphs of this Complaint.**

67. Avertium delivered valuable services to ProtoCall.

**<u>RESPONSE</u>: Denied.**

68. ProtoCall accepted and received the benefit of the services.

**<u>RESPONSE</u>: Denied.**

69. Avertium has not been fully compensated for the benefit it conferred on ProtoCall.

**<u>RESPONSE</u>: Denied.**

70. It would be inequitable and unjust for ProtoCall to retain the benefit and value of Avertium's services without paying for the benefits and value it received.

**<u>RESPONSE</u>: Denied.**

## <u>PRAYER FOR RELIEF</u>
**[pled by Avertium]**

**<u>RESPONSE</u>: The remainder of the Complaint contains Avertium's prayer for relief to which no response is required. To the extent a response is required, Protocall denies that Avertium is entitled to any relief as against Protocall, whether prayed for or otherwise.**

## <u>AFFIRMATIVE DEFENSES</u>

Having fully replied to all allegations in the Complaint, Protocall affirmatively asserts the following facts and defenses supported by Protocall's responses to the allegations in the Complaint and additional facts alleged as follows:

1. The Complaint fails to state a claim for which relief can be granted, in whole or in part, and should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

2. **<u>First Material Breach</u>.** Avertium's contract claim is barred, in whole or in part, by Avertium's first material breaches of the applicable contracts (collectively the "Contract"). Avertium materially breached the Contract by, *inter alia*:

(a) Failing to provide the GRC Portal for over 19 months;

(b) Misrepresenting its 3PAO capability, rendering FedRAMP and related services impossible to deliver without additional expenses, which were undisclosed to

Protocall and not otherwise agreed to;

(c) Unilaterally substituting contracted services, such as LogRythym to MDR and FedRAMP to StateRAMP, at an undisclosed expense to Protocall that was not contemplated by any of the Contract documents nor otherwise agreed to; and

(d) Failing to cure its breaches after notice from Protocall.

All of these first material breaches by Avertium, both collectively and individually, excused any further performance by Protocall. Prior to these breaches by Avertium, Protocall had fully complied with all of its contractual obligations.

3. **Good Faith and Fair Dealing.** Avertium's claims are barred, in whole or in part, by its breach of its implied duty of good faith and fair dealing imposed upon every contract under Tennessee law. Avertium failed to perform its obligations reasonably, fairly, and in good faith by, *inter alia*, failing to timely provide contracted services, misrepresenting its capabilities and qualifications, attempting to unilaterally revise its contractual obligations, failing to disclose expenses that would be incurred by Protocall, failing to cure its deficiencies after notice from Protocall, and acknowledging receipt of Protocall's termination notice only to deny that Protocall was entitled to termination and to later assert Protocall failed to strictly comply with the addressee of the notice. This conduct deprived Protocall of the benefit of the Contract: receiving competent services at the agreed upon price and other terms.

4. **Setoff/Recoupment.** In the event Avertium prevails on any claim, its damages are limited, in whole or in part, by the doctrines of setoff and recoupment for the damages Protocall incurred as a result of Avertium's breaches alleged in these Affirmative Defenses, *supra*. These damages include, *inter alia*:

(a) Refund Damages: Protocall paid Avertium a total of $772,630.60. A substantial portion of these fees were paid for services that were never delivered, were materially deficient, or were induced by misrepresentations.

(b) GRC Platform Cover Damages: $28,500 paid for a platform never delivered. Replacement (ControlMap): $18,000/year ($1,500/month);

(c) Lack of Auditability/Consultant Costs: $40,500 ($4,500/month × 9 months, December 2024–August 2025) to retain a former IT Director/Security Officer to perform compliance work Avertium was contractually obligated to provide;

(d) HITRUST Recertification Delay: $4,400 (11 customer cybersecurity questionnaires × 7 hours each × $400 labor cost per questionnaire that Protocall's staff was required to complete due to Avertium's non-performance); and

(e) LogRhythm Migration Costs: $27,682.80 (two months' fees) for forced migration to Agile Blue necessitated by Avertium's unilateral SIEM swap.

5. **<u>Contractual Limitations Period</u>.** Avertium's claims are time-barred, in whole or in part, by the one-year contractual limitations period, for which the Contract provides, "No legal action may be brought by one Party against the other Party more than one (1) year after the event giving rise to the cause of action, except for actions due to non-payment of Fees or violation of Avertium's IP Rights." Protocall sent its notice terminating the Contract on September 30, 2024 (the "Termination Notice") (Complaint, ¶ 45). While Avertium casts its action as one for non-payment of fees over the course of almost two years after the Termination Notice was sent, the gravamen of this dispute is not non-payment—it is whether the Termination Notice validly terminated the Contract. Thus, Avertium's claim is actually for an alleged anticipatory breach that occurred in September 2024, and not the non-payment of fees for the ensuing two years. As a result, Avertium's claims are time barred because it did not file suit within the one-year contractual

limitations period following the Termination Notice.

6. **Effective Termination.** Avertium's claims are barred, in whole or in part, because Protocall effectively terminated the Contract with the Termination Notice (Complaint, ¶ 45). The Termination Notice substantially complied with the Contract's termination provision, despite not being addressed as alleged by Avertium (Complaint, ¶¶ 16, 17, 45-48). Thus, the Contract was no longer enforceable against Protocall as of the date of Protocall's last payment to Avertium (Complaint, ¶ 54).

7. **Waiver and Estoppel.** Avertium's claims are barred, in whole or in part, by the doctrines of waiver and estoppel. Even if the Termination Notice was technically deficient, Avertium's representatives (Matt Ryan and Rob Wille), upon receipt of the Termination Notice and for months thereafter, did not dispute the Termination Notice for being technically deficient for failure to be addressed as alleged by Avertium (Complaint, ¶¶ 16, 17, 45-48). Instead, these representatives acknowledged receipt of the Termination Notice, clearly acknowledged Protocall's intent to terminate the Contract, but disputed that Protocall had any right to terminate the Contract at all. It was not until many months later, in correspondence from counsel, that Avertium disputed the Termination Notice's strict compliance as alleged by Avertium (Complaint, ¶¶ 16, 17, 45-48). By virtue of this conduct, Avertium waived any right it may have had to enforce Protocall's strict compliance with the termination provisions, and is now estopped from the same.

8. **Unclean Hands.** Avertium's claims are barred, in whole or in part, by the doctrine of unclean hands. Avertium is precluded from enforcing any rights in this action because of its misconduct alleged in these Affirmative Defenses, *supra*.

9. **Equitable Claims Barred.** Avertium's equitable claims are barred, in whole or in part, by the existence of an express written contract governing the parties' transactions.

10. **Failure to Mitigate.** In the event Avertium prevails on any claim, its damages are limited, in whole or in part, by Avertium's failure to mitigate the same. Avertium failed to take reasonable steps to mitigate its damages to the extent it continued to provide any services or incur any expenses after Protocall gave the Termination Notice.

## PRAYER FOR RELIEF
**[pled by Protocall]**

Having fully replied to all allegations in the Complaint and affirmatively stated facts and defenses thereto, Protocall requests that the Court grant the following relief:

A. Dismissal of the Complaint with prejudice;

B. Award of Protocall's damages as setoff to any claims prevailed upon by Avertium;

C. Award of Protocall's reasonable expenses and attorneys' fees;

D. Any additional relief that this Court deems equitable and just.

Respectfully submitted,

PEPPER MEEKS & WHITAKER

*s/Jimmy B. Meeks Jr.* ________
Jimmy B. Meeks Jr. (BPR #39830)
1801 West End Ave, Suite 850
Nashville, Tennessee 37203
(615) 256-4838
*jmeeks@pepperlawplc.com*
**Attorneys for Defendant Protocall**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document—and all exhibits thereto, if any—have been served via filing with the Court's CM/ECF system on September 21, 2026. Service to:

Benjamin S. Morrell
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
(312) 527-4000
*bmorrell@taftlaw.com*
**Attorneys for Plaintiff Avertium**